## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RAMONITA KING** | : | |
| **7817 Farnsworth Street** | : | |
| **Philadelphia, PA 19157** | : | |
| *Plaintiff*, | : | |
| v. | : | |
| | : | |
| **CITY OF PHILADEPHIA** | : | **COURT OF COMMON PLEAS** |
| **d/b/a PHILADELPHIA** | : | |
| **POLICE DEPARTMENT** | : | **PHILADELPHIA COUNTY** |
| **1515 Arch Street, Suite 15** | : | |
| **Philadelphia, PA 19102** | : | **CIVIL ACTION** |
| | : | |
| *And* | : | **No. 2:24-cv-01003** |
| | : | |
| **CAPTAIN JASON SMITH** | : | |
| **1515 Arch Street, Suite 15** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| *And* | : | |
| | : | |
| **LT. DANIEL BROOKS** | : | |
| **1515 Arch Street, Suite 15** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| *And* | : | |
| | : | |
| **LT. HAMILTON MARSHMOND** | : | |
| **1515 Arch Street, Suite 15** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| *And* | : | |
| | : | |
| **INSP. CHRISTOPHER WERNER** | : | |
| **1515 Arch Street, Suite 15** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| *Defendants*. | : | |

## <u>COMPLAINT</u>

Plaintiff, Ramonita King ("Plaintiff" or "Det. King"), through her attorneys, van der Veen,

Hartshorn, Levin, and Lindheim, by Bruce L. Castor, Jr. and Kaitlin C. McCaffrey, asserts the

following Complaint against Defendants City of Philadelphia (the "City") d/b/a Philadelphia Police Department (the "Department"), Captain Jason Smith, Lieutenant Daniel Brooks, Lieutenant Hamilton Marshmond, and Chief Inspector Christopher Werner for violations of her rights under the Fourteenth Amendment to the United States Constitution, the Civil Rights Act of 1964, 42 U.S.C. § 1983, the Pennsylvania Whistleblower Act, 42 P.S. § 1421, *et seq*., Title VII, 42 U.S.C. § 2000(e), *et seq*., and the Pennsylvania Human Relations Act, 42 P.S. §951, *et seq*.

Detective Ramonita King has dutifully served the Philadelphia Police Department for more than three decades, working as a detective since 1998.  During her considerable tenure with the Department, Det. King found herself the target of gender-based discrimination on numerous occasions, but repeatedly tried to move past these incidents based on her knowledge of how the Department handles such complaints and fear of retaliation.  However, shortly after her transfer to the Philadelphia Police Department—Homicide Unit ("Homicide Unit"), Det. King could no longer ignore the rampant sexism and retaliation directed toward her, her female colleagues, and anyone who chose to advocate for them.

When two other detectives filed a complaint alleging gender-based discrimination and retaliation against several supervisory officers within the Homicide Unit, Det. King became a target due to her friendship with these detectives and her perceived involvement with their complaint.  Det. King regularly spoke to these detectives about the discriminatory treatment she endured in the Homicide Unit, and the complaining detectives brought these issues to light as part of their formal grievance.  Det. King attempted to persuade the involved supervisors that she did not intend to make any trouble for the Unit, but her supervisors remained unconvinced.  Over the next two years, Det. King found herself the victim of various false reports, intimidation tactics,

and adverse employment actions intended to both discredit her testimony and dissuade her from pursuing this matter further, leaving her with no option but to file this suit.

## PARTIES

1.      Plaintiff Ramonita King is and was at all relevant times an adult residing within Philadelphia County, Pennsylvania.  At all material times hereto, Plaintiff served as a detective with the Philadelphia Police Department's Homicide Unit.

2.      Defendant City of Philadelphia d/b/a Philadelphia Police Department is a political subdivision of the Commonwealth of Pennsylvania, which employs Plaintiff.  The City's Offices and Agencies include the Philadelphia Police Department, which was at all material times hereto responsible for screening, hiring, training, supervising, and disciplining its agents, servants, and employees, including the individual Defendants.

3.      The Philadelphia Police Department—Homicide Unit is currently located at 400 N. Broad Street, Philadelphia, PA 19130 and until on or about February 1, 2022, it was located at the Roundhouse Building at 750 Race Street, Philadelphia, PA 19106.

4.      Defendant Jason Smith is an adult male who, at all material times hereto, was employed as a Captain assigned to the Homicide Unit.  Defendant Smith is sued both individually and in his official capacity.

5.      Defendant Daniel Brooks is an adult male who, at all material times hereto, was employed as a Lieutenant assigned to the Homicide Unit.  Defendant Brooks is sued both individually and in his official capacity.

6.      Defendant Hamilton Marshmond is an adult male who, at all material times hereto, was employed as a Lieutenant assigned to the Homicide Unit.  Defendant Marshmond is sued both individually and in his official capacity.

7.      Defendant Christopher Werner is an adult male who, at all material times hereto, was employed as a Chief Inspector assigned to supervise the Investigations Unit.  Defendant Werner is sued both individually and in his official capacity.

8.      At all times relevant to this complaint, Defendants acted under the color of state law.

9.      At all times relevant to this complaint, Defendants were "employers" and Plaintiff was an "employee" within the meaning of applicable law.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to Title VII of the Civil Rights Act of 1965, as codified, 42 U.S.C. § 2000e to 2000e-17, and 42 U.S.C. § 1983.  Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343(3) and the aforementioned statutory and constitutional provisions.

11.     Jurisdiction lies over state law claims based on the principals of supplemental jurisdiction, as codified at 28 U.S.C. § 1367.

12.     Pursuant to E.D.Pa.Loc.R.Civ.P. 53.2(3)(A), this case is not subject to compulsory arbitration because Plaintiff alleges violation of the rights secured under the United States Constitution.

13.     Venue is proper pursuant to 28 U.S.C. §1391(d) given that all Defendants are headquartered within the applicable jurisdictional territory and/or all events giving rise to this Complaint occurred within the confines of Philadelphia, PA.

## FACTS AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     Plaintiff Ramonita King began her employment with the Philadelphia Police Department in 1990 as a patrol officer.  The Philadelphia PD subsequently promoted Plaintiff to detective in 1998.

15.     Plaintiff worked in the Central Detectives Unit for approximately two years, before transferring to the Background Unit where she worked until 2003.  Following her assignment to the Background Unit, Plaintiff was transferred to the East Detectives Unit where she worked for the next fifteen (15) years.

16.     Around December 2019, Captain Jason Smith personally requested that Det. King join the Homicide Unit.  He informed Det. King that he needed a Hispanic female detective, as the previous detective who met this criterion recently retired.

### A.  THE HOMICIDE UNIT'S DISCRIMINATORY PRACTICES AND GENERAL HOSTILITY TOWARD FEMALE DETECTIVES

17.     Before detailing Plaintiff's personal experience, it is important to understand the general dynamic and struggles experienced by women within the Philadelphia Police Department, specifically the Homicide Unit.

18.     The Philadelphia Police Department recurrently finds itself embroiled in allegations of sexual harassment and gender-based discrimination, presenting a persistent challenge within its organizational landscape.

19.     The Homicide Unit has long represented the epitome of this sexist, male-dominated culture where women are treated as inferior.

20.     Female detectives assigned to the Homicide Unit are often seen as diversity hires and denied the support and training needed to succeed within the Unit.

21.     At all times relevant to this Complaint, the Homicide Unit employed seventy-seven (77) detectives, only six (6) of whom are female, and only half of the female detectives worked in the actively on the street.   Further, except for a single female sergeant, the Homicide Unit supervisory ranks are entirely made up of men.

22.     Male detectives are instructed not to help their female counterparts in the Homicide Unit, leaving them to fend for themselves, unless the female detective agrees to work the desk or do administrative jobs.

23.     Female detectives are either assigned a partner by their supervisors or denied a partner entirely, while their male counterparts are permitted to choose their preferred partner.

24.     Homicide cases are extremely difficult and time consuming, making these cases nearly impossible to solve alone at the same rate as paired partners.

25.     The Homicide Unit also employs a policy of not permitting detectives to conduct any investigations on the streets without a partner, meaning that a female detective without a partner must request the assistance of another detective each time she wants to go out on the to the street to locate witnesses or recover possible video footage.

26.     Supervisors in the Department engage in a practice of transferring women between squads to create the impression of diversity, while treating these women as dispensable because many male detectives prefer to work with other men and this practice is both permitted and ratified by the upper management.

27.     The Homicide Unit handles complex, significant cases that tend to require detectives not only to work closely with their partners, but also with an entire team of detectives, to ensure prompt and efficient clearance of these cases.

28.     Female detectives in the Homicide Unit are not considered part of the "team," and therefore not garnered the same support and assistance, which creates an almost impenetrable barrier to efficiently investigating and clearing these cases.

29.     Supervisors of the Homicide Unit also regularly delegate administrative tasks, such as covering the phones or desk duty, to female detectives, while the same supervisors never assign male detectives such tasks unless they are facing disciplinary issues or voluntarily take the assignment.

30.     The Philadelphia Police Department—Homicide Unit is currently facing at least one other lawsuit for sex-based discrimination and retaliation in violation of 42 U.S.C §1983, Title VII, and the Pennsylvania Human Relations Act ("PHRA").  *See*, *Slobodian, et al. v. City of Phil., et al.*, Docket No. 2:22-cv-00831.

31.     Detectives Danielle Slobodian and Shawn Leahy filed a complaint with this Court on March 4, 2022, alleging rampant gender-based discrimination in the Homicide Unit and retaliation for reporting misconduct and abuse of authority.  That lawsuit is pending before this Court.

### B.  SEX-BASED DISCRIMINATION AND RETALIATION AGAINST DETECTIVE RAMONITA KING

32.     Det. King began working in the Homicide Unit in December 2019, after more than twenty (20) years of experience as a detective with the Philadelphia Police Department.

33.     Upon arrival, Det. King's supervisors failed to assign her a partner.  Det. King repeatedly requested a partner assignment, but her supervisors ignored or denied her requests, despite supervisors ensuring that new male detectives were immediately paired with a partner upon joining the Unit.

34.     Twelve (12) detectives newly assigned to the Homicide Unit in 2021 each received a partner upon arrival.  However, Det. King did not receive a partner for more than two years after joining the Homicide Unit.

35.     Det. King attempted to handle her caseload without a partner, but due to the policy restrictions as detailed above making her unable to conduct investigations in the field without first finding a willing detective to go with her, substantially curtailed her ability to perform her job functions.  Det. King frequently struggled to find another detective to assist her on the streets, because she was the only detective without a partner in the Unit.

36.     Det. King would often resort to asking her supervisor to compel another detective to go into the field with her to investigate her cases, which only served to deepen the divide between Det. King and her peers.

37.     Supervisors further denied Det. King the opportunity to obtain additional training, interfering with her ability to adequately investigate the investigations assigned to her.

38.     Captain Smith informed Det. King in or around August 2021 that she would be transferred from squad "1-A" to "1-B" so that she could be assigned a partner.  She willingly accepted, eager for the opportunity to work with a partner.

39.     As part of this assignment, Det. King would be supervised not only by Captain Smith, but also by Lieutenants Hamilton Marshmond and Daniel Brooks.

40.     Not only did Det. King not receive a partner after transferring to the B-Squad, but supervisors assigned her clerical and administrative responsibilities that supervisors did not require of her male counterparts.

41.     Almost immediately after joining the B-Squad, Captain Smith assigned Det. King and another female detective, Detective Gail O'Brien, to process for evidence the vehicles held by police as part of ongoing homicide investigations.

42.     Captain Smith also assigned Det. King and Det. O'Brien to work the front desk and handle telephone calls, while leaving the male detectives to focus on their homicide investigations.

43.     Upon information and belief, Detective Joseph Murray from the 1-B squad requested Det. King as his partner, which the Department used to justify Det. King's transfer from 1-A to 1-B.  However, Det. Murray subsequently changed his mind and decided he no longer wanted Det. King as a partner.  Supervisors then assigned Det. King to desk duty, without a partner, and thus virtually unable to work the streets unless one of the partnered male detectives would condescend to work with her, or was ordered to do so by a supervisor.

44.     Lieutenant Brooks further reassigned one of Det. King's homicide cases to Det. Murray while she worked on processing vehicles and manned the front desk.  After Lieutenant Brooks and Det. Murray spoke to the family of the victim, the family filed an Internal Affairs complaint against Det. King.

45.     Det. King attempted to dutifully perform the tasks she was assigned, but still found herself unable to complete her work without the cooperation of her male counterparts.  In order to process a vehicle, Det. King needed a search warrant, which required the investigating officers to submit an application based on their knowledge of the underlying probable cause; however, the investigating officers were either reluctant or unwilling to comply with Det. King's request that they submit such an application.

46.     the investigating officers who had knowledge of the underlying probable cause, but the investigating detectives were either reluctant or unwilling to comply.

47.     Det. King brought her concerns about the male detectives' unwillingness to issue search warrants for vehicle processing to the attention of Captain Smith, but he failed to take any action to remedy the situation.

48.     In early September 2021, Detectives Danielle Slobodian and her fiancé, Detective Shawn Leahy, filed a joint complaint with the Internal Affairs Division ("IAD") and the Equal Employment Opportunity Office ("EEO") alleging gender-based discrimination and retaliation on the part of Captain Smith, Lieutenant Marshmond, and Lieutenant Brooks.

49.     Shortly thereafter, in or around October 2021, Det. King approached her only female superior, Sergeant Angjeanette Raysor, to discuss the possibility of transferring back to the 1-A squad due to her poor treatment.

50.     Det. King subsequently met with Sergeant Raysor and Lieutenant Marshmond to discuss her potential transfer.  Lieutenant Marshmond addressed Det. King in a demeaning and condescending tone, questioning her competence and why her male peers refused to work with her.  Sergeant Raysor remained silent during the entire interaction between Det. King and Lieutenant Marshmond.

51.     Ultimately, Lieutenant Marshmond informed Det. King that since she had a problem with the "B-Boys," referring to the male detectives on the 1-B squad, he would transfer her back to the 1-A squad.  Det. King begged Lieutenant Marshmond not to spread this rumor, knowing that this would cause issues for her throughout the Unit.  However, shortly after leaving his office, Det. King witnessed Lieutenant Marshmond huddled together talking with a group of male detectives, who quickly scattered when they saw her approach.

52.     Det. King returned to the 1-A squad, hoping things would return to normal, but soon discovered that her fears were founded, and Lieutenant Marshmond had spread word

throughout her squad that she left the 1-B squad due to her inability to get along with the male detectives.

53.     Captain Smith approached Det. King not long after she returned to the 1-A squad to inform her that Lieutenants Marshmond and Brooks planned to come after her due to her perceived involvement in Detectives Slobodian and Leahy's IAD/EEO complaint.

54.     Det. King begged Captain Smith to intervene and prevent Lieutenants Marshmond and Brooks from taking any action against her, but his warnings constituted the full extent of his willingness to intercede.   Captain Smith warned Det. King four or five times concerning the Lieutenants' vendetta against her, but he failed to take any action to protect Det. King from this backlash.

55.     Several months later, in February 2022, Captain Smith summoned Det. King and Lieutenant Thomas Walsh to his office under the guise of "checking in" about the Homicide Unit's recent move to a new building.   Det. King expressed during this conversation that women in the Homicide Unit are not treated with fairness and respect.   For example, Det. King and another female detective did not receive desks at the new location.   Det. King also provided Captain Smith with an honest account of what she witnessed occur between Detective Leahy and Lieutenant Brooks, which formed the basis for Detective Leahy's EEO complaint.   Det. King's account contradicted Lieutenant Brooks' claim as to what occurred, which angered Captain Smith, and he demanded Det. King and Lieutenant Walsh leave his office.

56.     Lieutenant Walsh asked Det. King, who was visibly upset, to come into his office to discuss the situation.   While the pair were discussing what occurred, Captain Smith burst into Lieutenant Walsh's office and directed the Lieutenant to file an EEO complaint on Det. King's behalf given her allegations.

57.     Det. King began crying, pleading with Captain Smith not to force her to file an EEO complaint, knowing that Lieutenants Marshmond and Brooks (and the other male detectives) would make her life in the Homicide Unit unbearable if she filed a complaint.

58.     Det. King urged Captain Smith to simply talk to the men in the Unit about their treatment of women in the workplace instead of forcing her to file a formal complaint, but Captain Smith commanded Lieutenant Walsh to file the complaint regardless of what she wanted.

59.     Det. King told Captain Smith that by filing the EEO complaint against her wishes, he placed not only her career, but her very life in danger.  She explained that approximately twenty years earlier, she filed an EEO complaint after experiencing similar gender-based discrimination. Det. King received threats on her life, her tires were slashed in the police parking lot, and the other officers would not respond to her calls for backup on the streets.  Det. King's supervisors ultimately sent officers to make false statements against her to Internal Affairs, and Det. King settled for a transfer to a new district.

60.     When Det. King returned to the office after Lieutenant Walsh filed the EEO complaint on her behalf, approximately half of the Homicide Unit refused to speak to her and greeted her with horrid, judgmental stares.

61.     One of Det. King's female peers, Detective Janal Craig, informed her that the entire Unit had been made aware of the EEO complaint alleging that no one would help her.

62.     Captain Smith finally assigned Det. King a partner, Detective Joseph Centeno, the following month, but unfortunately this did not end Det. King's workplace struggles.

63.     On April 7, 2022, Lieutenant Brooks made a loud comment to the Unit, "Who wants cheese?"  Det. King understood this comment in context as Lieutenant Brooks calling her a rat,

but later learned that Lieutenant Marshmond may have directed the comment toward Sergeant Raysor for reporting a recent incident in which her desk was vandalized.

64.     Det. King expressed concern to Detectives Slobodian and Leahy about the comment but did not report it out of a desire to "get along" within the Unit.  However, as Det. King would later learn, Det. Slobodian independently reported Lieutenant Brook's comment to his supervisors.

65.     The following day, April 8, 2022, Det. Leahy called Det. King while she was out for lunch to let her know Captain Smith wanted to speak with her.  When she returned with her lunch, Det. King placed her personal belongings on her desk before heading to Captain Smith's office.  However, before she could even place her things on her desk, Sergeant Raysor grabbed Det. King by the arm and physically dragged her toward Captain Smith's office, shoving her in the direction of the office before walking away.   Sergeant Raysor manhandled Det. King in full view of the entire Unit, causing Det. King shame and embarrassment.

66.     Despite initially being told to report to Captain Smith's office, Det. King subsequently learned she would be meeting with Lieutenants Marshmond and Walsh.

67.     Lieutenant Marshmond appeared visibly frustrated and angry when Det. King entered his office.  It was then that she learned Det. Slobodian reported the comment Lieutenant Brooks made the day intimating she was a rat.

68.     Lieutenant Marshmond proceeded to accuse Det. King of receiving special treatment.  Det. King feared that based on her previous experience, Lieutenant Marshmond would twist her words and spread his own version of their interaction around the Unit.

69.     Around June 2022, Det. King noticed Det. Murray rummaging through one of her files without her consent.  Det. King received a call not long after from the family of one of her

victims reporting that they were approached by a detective or a police officer and told that Det. King was tampering with evidence, could not testify in court, and was under investigation for misconduct.

70.     Ironically, Detective Murray is the only Homicide Unit detective deemed by the Philadelphia District Attorney's Office unable to testify, yet he is still permitted to handle homicide cases.

71.     A second family contacted Det. King to let her know that they were told Det. King would no longer be handling their son's case, because she stated their son was Black and might have killed someone else.

72.     Lieutenant Brent Conway from the EEO Unit contacted Det. King in the Summer of 2022, asking whether she wanted to move forward with her EEO complaint Lieutenant Walsh filed on her behalf.  Det. King advised that she did not want to pursue the complaint and that it was submitted without her consent.

73.     Lieutenant Conway asked Det. King whether she was scared to pursue the EEO complaint and she responded that she was terrified.  Det. King advised Lieutenant Conway that she was also afraid her higher-ups would have other officers make false complaints against her to discredit her, damage her career, or both based on her previous experience.

74.     Det. King's prediction came true a few months later when she learned Detective James Crone filed an Internal Affairs complaint alleging that she took an avocado and placed it between her breasts and touched him inappropriately.

75.     Former Police Commissioner Richard Ross previously removed Det. Crone from the Homicide Unit in 2018 after Crone wrote a colleague a hateful, harassing letter possibly with

racially motivated undertones.  This event in 2018 was not the first time Det. Crone had been removed from the Homicide Unit.

76.     Commissioner Ross also removed Det. Murray from the Homicide Unit during his tenure for lying under oath as part of a murder investigation.  However, after Commissioner Ross resigned as police commissioner, supervisors allowed Dets. Crone and Murray to quietly return to the Homicide Unit.

77.     The "avocado" allegation was not Det. King's first interaction with Det. Crone.  In June 2021, Det. Crone sent Det. King several unsolicited, inappropriate sexually explicit pictures and messages.  She retained copies of these messages but chose not to report Det. Crone to avoid getting him into trouble in an effort not to create further excuses for retaliation against her by male members of the Unit.

78.     Lieutenant Conway informed Det. King that it was actually Lieutenant Marshmond who filed the IAD complaint on Det. Crone's behalf.  Det. Crone worked directly under Lieutenant Marshmond in his office.

79.     Det. King also learned that Det. Crone received an favorable transfer immediately after filing the IAD complaint to the Homicide Fugitive Unit, effectively granting him a considerable pay increase while affording him weekends off.

80.     On January 5, 2023, Det. Crone approached Det. King's desk, smirking and laughing, attempting to antagonize and upset her.  Det. King immediately contacted Lieutenant Conway, advising him of the situation and demanding he remove Det. Crone from the building.

81.     Lieutenant Conway contacted Lieutenant Walsh, who advised Lieutenant Marshmond of the situation.  Lieutenant Marshmond then walked past Det. King and yelled, "What are we in high school?"

82.     Shortly after Lieutenant Marshmond left her desk, Det. Crone returned to continue antagonizing her.  Det. King contacted Lieutenant Conway again, who promised to contact his captain, but did not appear to follow through.

83.     Unsatisfied with the response of her superiors, Det. King approached Chief Inspector Charles Layton and advised him of the situation.  Chief Inspector Layton immediately ordered Det. Crone to leave the building.

84.     Det. King returned to her desk the next day to find a bag with an embroidered avocado on the front placed above her desk.  She immediately recognized this as reminiscent of Det. Crone's allegations which someone had strategically placed there to further antagonize her. She promptly advised Lieutenant Conway of this development and he told her to take a picture of the bag as well as preserve it in an evidence bag.

85.     On January 19, 2023, Det. King was scheduled to appear before Internal Affairs in connection with Det. Crone's allegations.  Det. King sent a desperate email to her higher-ups prior to this hearing pleading for assistance with her situation.

86.     Chief Inspector Layton asked Det. King to come to his office in response to her email.  While Det. King informed Chief Inspector Layton what was going on, Inspector Christopher Werner burst into Chief Inspector Layton's office and insisted Det. King go to the Employee Assistance Program ("EAP").  The EAP is a unit of the Police Department established supposedly to hear officer complaints but used instead to collect information to relay to supervisors for them to use against the complaining officer.

87.     Det. King told Inspector Werner that she did not want to go to EAP and would prefer to go home, given how emotional the situation made her.  However, Inspector Werner insisted that Det. King go to EAP.

88.     Det. King agreed that she would go to EAP and stated she would drive over immediately.

89.     Inspector Werner told Det. King that she would not be able to drive herself to EAP and that he would have officers come pick her up.  Shortly thereafter, Lieutenant James Ferguson and Patrol Officer Roslyn Tally from the EAP Unit arrived to transport Det. King.

90.     Det. King felt like a prisoner in the custody of the EAP Unit and advised Lieutenant Ferguson that she just wanted to go home.  Lieutenant Ferguson displayed empathy for Det. King's predicament and agreed to speak to Det. King in the conference room and not force her to go to the EAP Unit.

91.     Importantly, Inspector Werner, Lieutenant Brooks, and Detective Murray's father worked together on the force for many years and are extremely close.

92.     Det. King spoke with Lieutenant Ferguson and Officer Tally for about forty-five minutes, explaining the situation and her frustration with her superiors.

93.     Lieutenant Ferguson informed Det. King she was free to leave after they finished their conversation; however, shortly thereafter, Lieutenant Ferguson received a call that Inspector Werner would be by momentarily to speak with Det. King.

94.     Det. King immediately stated to Lieutenant Ferguson and Officer Tally that Inspector Werner would be taking her gun.  Lieutenant Ferguson and Officer Tally appeared confused, asking why Det. King would believe Inspector Werner would do such a thing.

95.     Det. King informed Lieutenant Ferguson and Officer Tally that the Philadelphia Police Department often used this tactic against women on the force who chose to speak up and seek help after being harassed or discriminated against.  The Department would concoct a story

about mental illness to discredit anything the officer said and take her gun to solidify the story and make the officer feel unsafe.

96.    Just as Det. King predicted, Inspector Werner appeared a few minutes later and demanded Det. King's gun.  Inspector Werner explained that he did not like the email Det. King sent concerning the failure of her supervisors to take action to prevent her continued harassment. Inspector Layton and another female sergeant witnessed this interaction, but failed to take any action.

97.    Inspector Werner then ordered Det. King to go to the EAP Unit the following day, her day off, against Department policy.

98.    On January 21, 2023, Lieutenant Walsh called Det. King and advised that she would need to come collect her belongings from the Homicide Unit and turn in all cases she was working on.  Det. King heard a familiar beeping sound and asked Lieutenant Walsh whether she was being recorded, which he admitted she was and apologized.

99.    Det. King arrived at the Homicide Unit two days later to collect her things.  She was told that she could not come in without calling the Unit and advising a supervisor she was there to collect her belongings.

100.    While Det. King packed her things, Inspector Werner approached her desk, smirking and laughing.  Inspector Werner sought to invoke a reaction from Det. King in front of the entire Unit, but she kept calm, realizing what he was trying to accomplish.

101.    Det. Murray also approached Det. King while she packed her things, similarly, attempting to elicit a reaction, but Det. King retained her composure.

102.    On January 25, 2023, Det. King began her new assignment with the Gun Permit Unit, which constituted a significant pay decrease due to the lack of overtime opportunities.

103.     Det. King opened the drawer of her desk to find a plastic rat inside.  Visibly upset, Det. King left and called Det. Leahy about what occurred.  He told her to report the incident, but she did not want to make her situation any worse and insisted on letting it go.

104.     Det. Leahy reported the toy rat incident despite Det. King's request otherwise and she was summoned by Internal Affairs to speak about the incident.  However, by the time she arrived back to her desk, one of the civilians had already cleaned up the desk and thew out the rat toy.

105.     Lieutenant King, one of Det. King's new supervisors, advised that the rat was likely left there as a leftover Halloween decoration, but several employees advised that the Unit had not celebrated Halloween in years.

106.     On February 9, 2023, Det. King took leave under the Family Medical Leave Act ("FMLA") due to the stress caused by her workplace environment.  She believed that the situation would be resolved by the time she returned from leave, particularly since she would have medical clearance to return, which she thought might assist in getting police supervisors to return her gun to her.

107.     Det. King returned from FMLA leave on March 11, 2023, hoping any lingering bad feelings toward her had cooled down, though the Department refused to return her firearm despite her medical clearance.

108.     To date, the Department refuses to return Det. King's issued firearm and will not provide her with any clear directive as to what she must do in order to have her police privileges restored.

109.    The Department claims that Det. King needs to be examined by its doctor before Det. King's privileges can be restored.  Incongruously, the Department insists this must wait until the current examining doctor, Dr. Hayes, *retires*.

110.    Upon information and belief, Dr. Hayes indicated to the Department that he would not order further psychiatric evaluations if he evaluated Det. King for the return of her firearm, which is why the Department insists she wait.

111.    On September 26, 2023, Lieutenant Wanda Newsome with the Gun Permit Unit asked Det. King to come to her office.  Lieutenant Newsome told Det. King that she received a call from the Homicide Unit that an email would be sent to Det. King for her to sign 75-18's, which are disciplinary action reports.

112.    Det. King learned that disciplinary action had been taken against her for failing to cooperate with the IAD investigation into Det. Crone's allegations.

113.    The Department falsely alleged that Det. King failed to cooperate with the IAD investigation.  Det. King had not received any notice to appear as part of the IAD investigation since returning from FMLA leave and thus no longer believed IAD required her cooperation.

114.    On November 9, 2023, Lieutenant Newsome once again asked Det. King to come into her office, because Lieutenant Marshmond contacted her the previous day demanding to know why Det. King had not yet signed the 75-18's.

115.    Ultimately, Internal Affairs dismissed Det. Crone's allegations against Det. King as unfounded, without Det. King testifying or offering a statement on the matter.

116.    Det. King repeatedly brought her concerns regarding the rampant sexism and retaliation in the Department, specifically the Homicide Unit, to the attention of various senior officials, including Police Commissioner Danielle Outlaw, Deputy Commissioner Robin

Wimberly, and Chief Inspector Charles Layton.  These pleas for action were either dismissed or ignored.

117.    On November 1, 2023, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") detailing the harassment and retaliation outlined herein.

118.    The EEOC issued a Right to Sue letter on December 8, 2023.

**COUNT ONE**
**VIOLATION OF 42 U.S.C. 1983**
**FOURTEENTH AMENDMENT—EQUAL PROTECTION**
**Plaintiff v. Defendants Smith, Werner, Marshmond, and Brooks**

119.    Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

120.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids disparate treatment on the basis of sex.

121.    Plaintiff, as a female employee, was a member of a protected class.

122.    At all relevant times herein, Defendants Smith, Werner, Marshmond and Brooks acted under the color of state law in their capacities as supervisory officials within the Philadelphia Police Department.

123.    Based upon the conduct and actions described herein, Defendants intentionally denied Plaintiff the right to the same terms, conditions, privileges, and benefits of employment afforded to similarly situated male employees, in contravention of the Equal Protection Clause of the Fourteenth Amendment.

124.    Defendants' actions created and fostered a pervasive and persistent hostile work environment wherein women were treated as inferior compared to their male counterparts based solely on their gender.

125.    Said hostile work environment caused Plaintiff significant harm and distress and would have similarly impacted any reasonable women in her position.

126.    Defendants Smith, Werner, Marshmond, and Brooks directly participated in the actionable conduct alleged by Plaintiff, intentionally discriminating against Plaintiff based upon her gender.

127.    Defendants, acting under color of state law, violated and deprived Plaintiff of her well-established and well-settled civil right to be free from disparate treatment based on her gender in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

128.    As a direct and proximate cause of Defendants conduct, Plaintiff suffered significant damages, including but not limited to lost wages and benefits, pain and suffering, mental anguish, humiliation, and reputational damage.

129.    Defendants acted with reckless and callous indifference to the federally protected rights of Plaintiff, warranting an award of punitive damages to the fullest extent permitted by law.

130.    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees under 42 U.S.C. §1988.

## COUNT TWO
## VIOLATION OF 42 U.S.C. 1983
## SUPERVISORY LIABILITY
### Plaintiff v. Defendant Smith

131.    Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

132.    At all relevant times herein, Defendants Smith acted under color of state law in his capacity as the Captain of the Philadelphia Police Department—Homicide Unit.

133.     Defendant Smith bore responsibility for supervising Lieutenant Marshmond, Lieutenant Brooks, Detective Murray, and Detective Crone at all relevant times to this Complaint.

134.     Defendant Smith had actual knowledge of the hostile work environment created and fostered by the actions of Lieutenant Marshmond, Lieutenant Brooks, Detective Murray, and Detective Crone, yet failed to take any action to remedy or improve the situation.  As such, Defendant Smith acquiesced to the conduct of his subordinates in violating Plaintiff's right to equal protection.

135.     Based upon the conduct and actions described herein, Defendant Smith denied Plaintiff the right to the same terms, conditions, privileges, and benefits of employment afforded to similarly situated male employees, in contravention of the Equal Protection Clause of the Fourteenth Amendment.

136.     As a direct and proximate cause of Defendant Smith's conduct, Plaintiff suffered significant damages, including but not limited to lost wages and benefits, pain and suffering, mental anguish, humiliation, and reputational damage.

137.     Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees under 42 U.S.C. §1988.

**COUNT THREE**
**VIOLATION OF 43 PA.C.S. §1421,** *et seq***.**
**PENNSYLVANIA WHISTLEBLOWER ACT**
**Plaintiff v. City of Philadelphia**

138.     Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

139.     The Pennsylvania Whistleblower Act, 43 P.S. § 1421, *et seq*., provides that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment

because the employee…makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing…by a public body…as defined in this act." 43 P.S. § 1423(a).

140.    The Act further provides that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action." 43 P.S. § 1423(b).

141.    Plaintiff is a protected employee as defined by 43 P.S. § 1422.

142.    Defendants are covered employers as defined by 43 P.S. § 1422.

143.    Detectives Slobodian and Leahy named Plaintiff in their EEO complaint against Defendants Smith, Marshmond, and Brooks, alleging that she received adverse treatment as a result of her gender.

144.    Plaintiff also made numerous reports to supervisory personnel concerning the treatment of women in the Homicide Unit as well as the retaliation faced by those who complained.

145.    As a result of these reports and her perceived involvement in the other lawsuit, Plaintiff was treated with hostility and ostracized from her peers.

146.    The City, through its supervisory personnel, retaliated against Plaintiff by removing her from the Homicide Unit, transferring her to the Gun Permit Unit (resulting in lower pay), and taking her service weapon.

147.    As a direct and proximate result of Defendants violations of the Pennsylvania Whistleblower Law, Plaintiff suffered considerable damages and losses as set forth herein.

## COUNT FOUR
### TITLE VII, 42 U.S.C. § 2000e-2(a)
### HOSTILE WORK ENVIRONMENT—SEX
### Plaintiff v. City of Philadelphia

148.    Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

149.    At all relevant times hereto, the City of Philadelphia employed the individual Defendants in supervisory capacities.

150.    As a result of the conduct mentioned herein, Defendants created and fostered a hostile work environment which discriminated against female employees, such as Plaintiff, based on their gender.

151.    Plaintiff was subjected to disparate treatment, hostilities, verbal comments, and other intimidation and retaliatory actions based upon her gender.

152.    Defendants' conduct was pervasive enough to alter the conditions of Plaintiff's workplace and create a gender-based hostile work environment.

153.    Plaintiff brought her concerns regarding the Unit's hostile work environment to various high-level employees in the Department, including Captain Smith, Chief Inspector Layton, Commissioner Danielle Outlaw, and Deputy Commissioner Robin Wimberly.   As such, the Department received actual notice of Plaintiff's hostile work conditions yet failed to take any action to remedy the situation.

154.    Further, Chief Inspector Werner, Lieutenant Marshmond, and Lieutenant Brooks, all of whom are supervisors within the Department, directly and intentionally caused Plaintiff's hostile work environment.

155.    The City of Philadelphia, through its supervisory personnel, has acted upon a continuing course of conduct.

156.    The City of Philadelphia's violations were and are done intentionally, knowingly and/or with malice or reckless indifference and warrant the imposition of punitive damages.

157.    As a direct and proximate cause of the City's conduct, Plaintiff suffered significant damages, including but not limited to lost wages and benefits, pain and suffering, mental anguish, humiliation, and reputational damage.

**COUNT FIVE**
**TITLE VII, 42 U.S.C. § 2000e-2(a)**
**RETALIATION**
**Plaintiff v. City of Philadelphia**

158.    Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

159.    At all relevant times hereto, the City of Philadelphia employed the individual Defendants in supervisory capacities.

160.    Plaintiff engaged in a protected activity by reporting the disparate treatment of women in the workplace to numerous supervisory officials or individuals responsible for fielding and addressing such complaints, including but not limited to: Captain Smith, Lieutenant Conway, Lieutenant Ferguson, Chief Inspector Layton, and Chief Inspector Werner.

161.    Instead of addressing these concerns and/or providing Plaintiff with any support, the above-named City officials either failed to take any action or retaliated against Plaintiff by spreading the content of her complaints throughout the workplace, including to those against whom she complained.

162.    The City's supervisory officials knew or should have known that disseminating the contents of Plaintiff's private complaints to those against whom she accused of engaging in discriminatory conduct would result in retaliatory action.

163.   As a result of the City's conduct, through its supervisory personnel, Plaintiff endured harassment, ridicule, and hostility from her peers.  She felt unsafe and unwelcome in the workplace for bringing to light the disparate treatment of female employees.

164.   As a direct and proximate cause of the City's conduct, Plaintiff suffered significant damages, including but not limited to lost wages and benefits, pain and suffering, mental anguish, humiliation, and reputational damage.

## COUNT SIX
## PENNSYLVANIA HUMAN RIGHTS ACT
## HOSTILE WORK ENVIRONMENT—SEX
### Plaintiff v. City of Philadelphia

165.   Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

166.   At all relevant times hereto, the City of Philadelphia employed the individual Defendants in supervisory capacities.

167.   As a result of the conduct mentioned herein, Defendants created and fostered a hostile work environment which discriminated against female employees, such as Plaintiff, based on their gender.

168.   Plaintiff was subjected to disparate treatment, hostilities, verbal comments, and other intimidation and retaliatory actions based upon her gender.

169.   Defendants' conduct was pervasive enough to alter the conditions of Plaintiff's workplace and create a gender-based hostile work environment.

170.   Plaintiff brought her concerns regarding the Unit's hostile work environment to various high-level employees in the Department, including Captain Smith, Chief Inspector Layton, Commissioner Danielle Outlaw, and Deputy Commissioner Robin Wimberly.  As such, the

Department received actual notice of Plaintiff's hostile work conditions yet failed to take any action to remedy the situation.

171.     Further, Chief Inspector Werner, Lieutenant Marshmond, and Lieutenant Brooks, all of whom are supervisors within the Department, directly and intentionally caused Plaintiff's hostile work environment.

172.     The City of Philadelphia, through its supervisory personnel, has acted upon a continuing course of conduct.

173.     The City of Philadelphia's violations were and are done intentionally, knowingly and/or with malice or reckless indifference and warrant the imposition of punitive damages.

174.     As a direct and proximate cause of the City's conduct, Plaintiff suffered significant damages, including but not limited to lost wages and benefits, pain and suffering, mental anguish, humiliation, and reputational damage.

**COUNT SEVEN**
**PENNSYLVANIA HUMAN RIGHTS ACT**
**RETALIATION**
**Plaintiff v. City of Philadelphia**

175.     Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

176.     At all relevant times hereto, the City of Philadelphia employed the individual Defendants in supervisory capacities.

177.     Plaintiff engaged in a protected activity by reporting the disparate treatment of women in the workplace to numerous supervisory officials or individuals responsible for fielding and addressing such complaints, including but not limited to: Captain Smith, Lieutenant Conway, Lieutenant Ferguson, Chief Inspector Layton, and Chief Inspector Werner.

178.    Instead of addressing these concerns and/or providing Plaintiff with any support, the above-named City officials either failed to take any action or retaliated against Plaintiff by spreading the content of her complaints throughout the workplace, including to those against whom she complained.

179.    The City's supervisory officials knew or should have known that disseminating the contents of Plaintiff's private complaints to those against whom she accused of engaging in discriminatory conduct would result in retaliatory action.

180.    As a result of the City's conduct, through its supervisory personnel, Plaintiff endured harassment, ridicule, and hostility from her peers.  She felt unsafe and unwelcome in the workplace for bringing to light the disparate treatment of female employees.

181.    As a direct and proximate cause of the City's conduct, Plaintiff suffered significant damages, including but not limited to lost wages and benefits, pain and suffering, mental anguish, humiliation, and reputational damage.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court:

1.    Enter judgment in favor of Plaintiff and against Defendants for violation of her rights under Section 1983, Title VII and the PHRA;

2.    Declare that the actions of Defendants constituted unlawful discrimination;

3.    Award Plaintiff compensatory damages, including, but not limited to, lost wages and benefits, in such amount as will reasonably compensate her for her losses, and damages for emotional distress;

4.      Award Plaintiff punitive damages for Defendants' violations of Title VII not only for the egregious nature of the wrong the City of Philadelphia did to Plaintiff, but additionally to deter the City from such imperious conduct in the future in such amount as the Court deems proper;

5.      Award Plaintiff her costs, attorneys' fees, and non-taxable expenses in this action; and

6.      Grant Plaintiff such other and further relief as the Court deems equitable and just.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully Submitted,

Date: March 7, 2024              By:     *Bruce L. Castor, Jr.*
                                         Bruce L. Castor, Jr.
                                         I.D. No. 46370
                                         Kaitlin C. McCaffrey
                                         I.D. No. 329960
                                         Attorneys for Plaintiff
                                         1219 Spruce Street
                                         Philadelphia, PA 19107
                                         P: (215) 546-1000
                                         F: (215) 546-8529
                                         E: bcastor@mtvlaw.com
                                         E: kmccaffrey@mtvlaw.com