### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RAMONITA KING** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 24-1003** |
| | : | |
| **CITY OF PHILADELPHIA** *et al.* | : | |

**McHUGH, J.**                                                                                    **March 31, 2026**

### MEMORANDUM

The homicide unit of the Philadelphia Police Department has historically been staffed with mostly male detectives.  Plaintiff Ramonita King was assigned to help improve its gender balance in late 2019. The transition proved difficult, however, and Detective King was ultimately transferred to another unit in the Department with lower pay and fewer prospects, and without her service weapon.

Believing that she faced discrimination based on her gender and retaliation for making complaints, King brought this seven-count suit against the City of Philadelphia and four individual supervising officers, Chief Inspector Christopher Werner, Captain Jason Smith, Lieutenant Daniel Brooks, and Lieutenant Hamilton Marshmond. She claims that she was forced to endure a hostile work environment and suffered individual acts of discrimination. She also invokes the Pennsylvania Whistleblower Act.

Defendants move for summary judgment on all counts.  Plaintiff paints with a broad brush, but her core complaints of discrimination lack sufficient specific evidence, especially in meeting the demanding standard for proof of a hostile work environment.  I am therefore constrained to grant summary judgment on all accounts except for retaliation.  As to those claims, the evidence

is far stronger and the City's explanations for the employment actions are subject to genuine question, so the motion will be denied.

## I.    Relevant Facts

The parties have developed an extensive record.  Below is a summary of the most relevant facts.

### A.    December 2019-August 2021: Initial Assignment to Homicide Squad 1A

In December 2019, Plaintiff was invited to join the homicide unit by Captain Jason Smith. *See* Ramonita King Dep. 55:19-25, ECF 32-4.  Captain Smith had been requested by the Commissioner's office to find a female detective for the homicide unit, and he picked Plaintiff based on his past working relationship with her and her fluency in Spanish.  *See* Jason Smith Dep. 32:21-24:3, ECF 32-8. She would be in the clear minority in homicide, one of seven female detectives out of 80 in the unit. *See* Pl.'s Ex. A, Homicide Roster 2020, ECF 33-1.  It bears mention that she joined the homicide unit shortly before the COVID-19 pandemic began in March, 2020.

When Plaintiff started in homicide, she could not find a detective willing to match with her as a partner.  Partnership allows detectives to share the load of an assigned case.  *See* Thomas Walsh Dep. 81:22-92:13, ECF 33-27.  That said, partnership is informal and generally voluntary, and each detective was responsible for their own assigned cases.  *See, e.g.*, Charles Coan Dep. 33:16-34, ECF 33-29 ("nobody is assigned a permanent partner").  Four men who started in the squad at the same time quickly found partners to work their cases with them, but Plaintiff did not. *See* King Dep. 59:10-61:1.  Because the homicide unit does not permit detectives to investigate on the streets alone, without a partner Plaintiff would have to find a colleague to travel with her as she worked her cases. *See, e.g.*, Hamilton Marshmond Dep. 15:1-4, ECF 32-5.  According to

Plaintiff, approximately ten detectives joined the unit and found partners before Plaintiff got her first partner assigned by her lieutenant in 2022.  *See* Pl.'s Ex. B, EEO Complaint at 3, ECF 33-2.

Meanwhile, Plaintiff admittedly had some difficulty becoming proficient in the specific investigative techniques used in the homicide unit.  Plaintiff had been a detective for twenty years but had been working administrative roles for several years before coming to homicide and was not familiar with some of the unit's interview and evidence protocols.  *See* King Dep. 68:23-69:3.  Some of the areas Plaintiff allegedly struggled in included reviewing case activity sheets and vehicle warrants and simply being present for vehicle inventory searches—skills that one of her commanders called "detective 101."  Daniel Brooks Dep. 58:16-60:7, ECF 33-3.[1]  She also struggled with gathering evidence from modern cell phones and security cameras.  *See id.* 17:19-18:14.  Training in the homicide unit was largely informal, based on studying other detectives' files and work methods and collaborating with partners and peers.  *See, e.g.*, Smith Dep. 49:16-21 ("It's on the job training.  Basically, you're working with your fellow investigators and watching what they do, hopefully learning from them.").  This method of learning posed problems for Plaintiff, who at times struggled to work productively with her peers, allegedly shifting blame for her shortcomings and failing to learn from mistakes.  *See, e.g.*, Daniel Brooks Dep. 18:15-21:2 (describing peers' criticisms of Plaintiff's work and their frustrations with her alleged unwillingness to accept responsibility for errors); Charles Coan Dep. 44:18-46:22, ECF 33-29 (describing the need to place Plaintiff with more skilled detectives to "learn how to basically be a detective again," an effort which did not resolve problems with Plaintiff's search warrants).

---

[1] For clarity, this opinion will refer to defendant Daniel Brooks and non-party Tracy Brooks by their full names when citing to their respective depositions.

**B.**    **August 2021-October 2021: From Squad 1A to 1B and Back**

In August 2021, Lieutenant Brooks told Plaintiff she would be transferring to Squad 1B to finally get a partner, Detective Joseph Murray. *See* King Dep. 119:23-120. But by the time Plaintiff transferred, Detective Murray had found a different partner. *See* Joseph Murray Dep. 21:23-32:11, ECF 32-6. Captain Smith then offered Plaintiff an administrative role that involved processing search warrants and other paperwork on cars seized in investigations. *See* Daniel Brooks Dep. 46:24-48:6.

Not long after, Plaintiff asked to transfer back to Squad 1A. *See* King Dep. 76:24-77:2. Her 1B Squad commander, Lieutenant Hamilton Marshmond, called her into his office to discuss her transfer request. There, Lieutenant Marshmond asked her why the men were not helping her and why she did not have the same level knowledge of the men in the squad. *See* King Dep. 246:4-22; 249:15-21. As Plaintiff recalled it, Lieutenant Marshmond approved her transfer since she had been having "problems with the B-Boys," allegedly a term for the 1B Squad. *See id.* 98:1-98:11.

**C.**    **February 2022-April 2022: King's First EEO Complaint and the Slobodian-Leahy Lawsuit are Filed**

By January 2022, the Police Department transferred to a new headquarters. After Plaintiff realized she had not received a desk, she complained to Captain Smith that women were being treated unfairly in the unit. *See id*. 243:8-244:6; 244:2-245:1. Captain Smith responded that Plaintiff should file an internal EEO complaint. *See* February EEO Compl., ECF 33-4. Plaintiff testified that a coworker told her that awareness of the complaint had spread around the unit. *See* King Dep. 286:22-287:1, 314:1-2.

In March 2022 a lawsuit was filed by homicide detectives Danielle Slobodian and Shawn Leahy. *See generally* Slobodian-Leahy Compl., ECF 33-5. Leahy is male and was in a relationship

with Slobodian.  *See id.*  Their suit alleged overtime fraud in the homicide unit, and retaliation against them for exposing it, coupled with hostile work environment claims.  *See id.*  Their complaint cited Plaintiff's lack of an assigned desk and long wait for a partner as evidence of women's unequal treatment in the unit.  *See id.*

The Slobodian-Leahy lawsuit reverberated through the homicide unit.  Detective Murray would later testify that he stopped talking to Plaintiff at this time, as word had spread that she was involved with the lawsuit.  Murray Dep. 26:8-13.  And Plaintiff claims that Captain Smith walked by her desk and cautioned her that Lieutenant Brooks and Lieutenant Marshmond were "coming after her" based on her perceived role in the lawsuit. Pl.'s Resp. at 18, ECF 33; King Dep. 123:24-124:3. Captain Smith denies ever saying this.  *See* Smith Dep. 95:19-24.

In April, Plaintiff emailed Captain Smith and her new commander, Lieutenant Thomas Walsh, to raise various concerns.  *See* Pl.'s Ex. G, ECF 33-7.  She addressed her lack of a partner and reported communications from three families of deceased victims, who were upset by rumors that Plaintiff was under investigation for tampering with evidence and was prejudiced against Black decedents.  *See id.*  She also referred to the reassignment of one of her cases to Detective Murray, which was followed by a complaint against Plaintiff after Murray and Lt. Brooks met with the family.  *See* King Dep. 115:2-15.  Plaintiff suspects this incident was instigated by Detective Murray, *see id.* 115:19-21, while Murray claims all he did was tell the family member how to file a complaint if she wished.  *See* Murray Dep. 54:1-55:9-10.  And confounding the record further, Murray then arrested the family member lodging the complaint on an open warrant for robbery. *See* Pl.'s  Exhibit G at 2, ECF 33-7.  Plaintiff goes on to recount other instances of detectives filing complaints within the unit.  *See id.*  Notably, however, she refers to a male detective, Leahy, stating, "someone was doing something similar to Det. Leahy's cases and it was effecting [sic] his

families and Det. Leahy reputation." *Id.* As to the rumors about Plaintiff, in the instances she mentions in the email, in no case was a police officer identified as the source, except for her suspicions that Detective Murray encouraged the filing of a complaint. *See id.* But Plaintiff's email also recounts that Lt. Brooks accompanied Murray on the family visit, and Brooks told Plaintiff "oh she had a lot to say about you!" *Id.*

In her April email, Plaintiff also recounted that some men in the unit helped her with her work, while others were allegedly told to let her figure things out on her own. *See* Pl.'s Ex. G. Captain Smith forwarded the email to the Internal Affairs Division, *see* Smith Dep. 70:8-71:3, and the Equal Employment Office opened another complaint in response to the email. *See* Pl.'s Ex. B, ECF 33-2.

In the next few days, tensions over the Slobodian-Leahy lawsuit continued to grow. On April 7, Lieutenant Brooks, also a defendant in that lawsuit, loudly asked if anyone in the unit wanted cheese, but when Plaintiff looked to the office's usual table for shared food, there was no cheese. *See* King Dep. 291:10-292:21. In conversations with Detectives Slobodian and Leahy, Plaintiff mused about whether Brooks was calling her a rat for her EEO complaints and perceived involvement in their lawsuit. *Id.* Although Plaintiff later surmised Brooks was *not* referring to her, *see id.* 294:8-11, Slobodian and Leahy had in the meantime relayed Plaintiff's private reaction to Lieutenant Thomas Walsh, who filed a third EEO complaint in Plaintiff's name. *Id.*; *see also* Pl.'s Ex. H, ECF 33-8.

The next day, Lieutenant Marshmond called Plaintiff to his office to discuss the "cheese" incident. King Dep. 104:3-17; 105:5-7. Marshmond purportedly told Plaintiff that men in the unit resented her for getting the car processing role given its predictable hours and the number of men

who had waited years for reassignments. *Id.* 106:11-14.[2]  According to Plaintiff, he accused her of getting special treatment and getting everything she wanted. *Id.* 107:13-15; 108: 7-9; 79:24-25. The "cheese" incident also came to the attention of other command officers.  Of note, among Plaintiff's exhibits is an email on April 8 from Captain Danielle Vales to Lt. Brent Conway, expressing skepticism about Plaintiff's complaint: "The bottom line is she cannot perform that assignment and this is an excuse to deflect.  It's working."  Exhibit I, ECF 33-9.

A few days later, Detective Murray wrote a formal memo in support of Lieutenant Brooks and decrying "distracting misinformation permeating the unit."  *See* Pl.'s Ex. J, ECF 33-10.  He gathered signatures from the unit and posted it prominently to show that Brooks was popular in the unit and to show that the only detectives who had a problem with him were Slobodian, Leahy, and Plaintiff.  *See* Murray Dep. 61:10-18.

### D.    June 2022-July 2022: Plaintiff's Emails up the Chain of Command

On June 8th, homicide detective James Crone sent Plaintiff an email, nominally written as a friend, urging her to focus on mastering administrative work and spending time with family because she could simply never be a great homicide detective.  *See* Pl.'s Ex. K, ECF 33-11.  In July, an anonymous EEO complaint claimed without elaboration that Plaintiff was getting special treatment from Captain Smith due to a continuing "personal/sexual" relationship.  Pl.'s Ex. M, ECF 33-13.  Then in August, Detective Gail O'Brien told Plaintiff that Marshmond had implied Plaintiff was prejudiced against Black women.  *See* King Dep. at 309:7-14; 310:3-10.

---

[2] In Marshmond's deposition he conceded that this was conjecture on his part, not based on any expression of interest by more senior officers.  *See* Hamilton Marshmond Dep. 49:17-53:12, ECF 32-5.

As incidents accrued, Plaintiff became more persistent in emailing superiors in the Police Department and city government. In June she emailed then-Commissioner Danielle Outlaw and other high-ranking women in the Department to complain about homicide being a "boys club" in which women faced retaliation and false statements if they spoke out against hostile treatment. Defs.'s Ex. G, ECF 33-7. Two days later she wrote to Lieutenant Conway and several other colleagues and supervising officials in the Police Department and the Philadelphia District Attorney's Office. *See* Pl.'s Ex. L, ECF 33-12. Along with similar complaints of retaliation, Plaintiff included yet another communication from a homicide victim's family who had heard Plaintiff was tampering with evidence and committing other misconduct. *See id.* Lieutenant Conway connected Plaintiff with a representative from the City of Philadelphia's Employee Relations Unit. *See* King Dep. 329:5-8.

### E.    October 2022-November 2022: Detective Crone's EEO Complaint and Plaintiff's "Target" Email

In October, Detective James Crone sent two memos to Captain Smith alleging sexual harassment by Plaintiff: Crone claimed that she had placed an avocado down her blouse in a suggestive manner and had brushed his lower back while leaving the police headquarters. *See generally* Defs.' Ex. L & Ex. M, ECF 32-12 & 32-13. Crone conceded a desire to get his report filed because rumors had apparently spread that Plaintiff would soon file a lawsuit of her own. *See id.*; *see also* James Crone Dep. 92:20-21, ECF 33-14. Detective Crone had once had a positive relationship with Plaintiff, but had previously sent nearly-nude photos of himself and asked for them in return, actions Plaintiff said were unwelcome. *See* Pl.'s Ex. O, ECF 33-15 (showing photos); King Dep. 158:17-158:21 (describing the photos and request for reciprocation as

8

unwelcome).  Plaintiff did not report the incident when it occurred in June of 2021, but only after Crone filed his complaint against her.

Lieutenant Conway emailed Plaintiff to schedule an interview with her related to Crone's complaint, and she complained again that the department was treating this complaint more seriously than it had her own.  *See* Pl.'s Ex. Q, ECF 33-17.  Crone's complaint was eventually dismissed after video evidence failed to support his version of events and two other detectives present, both male, stated they did not see such an incident occur.  *See* Pl.'s Ex. FF, Conway EEO Report at 11, ECF 33-32.  Crone was then transferred to the reassigned to the Police Department's Fugitive Task Force and instructed to avoid contact with Plaintiff.  *See* Pl.'s Ex. P, ECF 33-16.

In November Plaintiff emailed Captain Smith and Lieutenant Walsh to convey that she believed she had a target on her back, with supervisors coordinating false reports of misconduct against her.  *See* Defs.' Ex. N, ECF 32-14.

**F.      December 2022- Forward: Plaintiff's Mass Email and Reassignment**

In December, Plaintiff complained again when Detective Crone appeared in the same work area as her.  *See* Pl.'s Ex. R, ECF 33-18.  The next time Crone entered the homicide unit, in early January 2023, Plaintiff approached him, apparently filming him to document his continued presence in the unit.  *See* Crone Dep. 138:4-23.  Later that day, Captain Smith saw that she was upset and approached her.  *See* Defs.' Ex. O, ECF 32-15.  He attributed her upset to Crone's presence, but believed Crone had a legitimate reason to be in the homicide unit that day.  *Id.*  Smith offered Plaintiff support from the Department's Employee Assistance officer and communicated with Crone's supervisor about protocols for when it was necessary for him to be near Plaintiff.  *Id.*  In communication with Chief Inspector Werner and other command officers, Smith observed that

he did not know whether Plaintiff's concerns were grounded in fact, but he perceived that she was sincere in her belief that she was being harassed.  *See* Defs.' Ex. O.

On January 10th, Plaintiff took notice of a reusable grocery bag from Aldi food market on the desk in front of hers, with the printed image of an avocado facing her desk.  King Dep. 155:14-157:14. She interpreted this as a reference to Detective Crone's October EEO complaint.  *Id*.

On January 19, 2023 Plaintiff sent her longest email yet, 23 printed pages long with over 40 pages of multimedia attachments.  *See* Defs.' Br. at 14, ECF 32.  The email was addressed to a variety of email addresses across the police department, city government, federal law enforcement, and Plaintiff's personal life.  *See* Defs.' Ex. P1, ECF 32-16.  The email's body, in long paragraphs dashed with capitalization, enlarged fonts, and exclamation marks, moved between Plaintiff's personal frustrations with the Department's handling of her complaints, Detective Crone's inappropriate behavior, the harassment and ostracization of female police officers she believed she had seen over her career, her belief in the inadequacy of the Department's internal disciplinary institutions, and her conclusion that reform would require federal intervention and the hiring of more police officers.  *See generally id.*  The attachments were a mix of personal and background documents, including pictures of Plaintiff throughout her long service; Crone's discouraging email; some suggestive texts he had sent Plaintiff; as well as news clippings about sexual harassment, retaliation, and corruption in the Philadelphia Police Department and other police forces around the country.  *Id.; see also* Defs.'s Ex. P2, ECF 32-17 (showing further attachments).

Later that day, a visibly upset Plaintiff was approached by Inspector Charles Layton, who brought her up to his office.  *See* King Dep. 270:20-271:3. There, Sergeant Nicole Judge and Chief Inspector Christopher Werner joined them and asked Plaintiff to speak to representatives from the Employee Assistance Program (EAP), which is the Department's internal psychological support

unit for police officers.  *See Id.* 276:20-277:6; *see generally* Defs.' Ex. Q, ECF 32-18 (describing EAP's functions and duties).

EAP's representative was Officer Tracy Brooks, who holds advanced degrees and certifications in mental health counseling, and Officer Roslyn Tally.  *See* Tracy Brooks Dep. 6:17-8:4, ECF 33-21. Plaintiff spoke to the two for over an hour in a private conference room.  *See id.* 33:9-18.  After the meeting, Officer Brooks opined to Chief Inspector Werner that Plaintiff did not meet the criteria to have her weapon revoked.  *See id.* 11:13-16.  According to Brooks, Werner repeatedly asked him asked to change his determination, but Brooks declined to do so.  *Id.* 41:15-42:24.  Nonetheless, Werner decided to confiscate Plaintiff's firearm.  *See* Werner Dep. 177:16-19; King Dep. 281:10.

From there, Werner implemented a reassignment.  First he submitted a memorandum requesting Plaintiff undergo an urgent mental health evaluation.  *See* Defs.' Ex. R, ECF 32-19.  He also had two other witnesses, Sergeant Judge and Inspector Layton, memorialize their experiences that day, but not Officer Brooks.  *See* Defs.' Ex. T, ECF 32-21, & Pl.'s Ex. V, ECF 33-22; Werner Dep. 172:8-10.  Chief Inspector Werner also sent a memorandum to the police commissioner requesting that Plaintiff be sent to the Gun Permits Unit.  *See* Pl.'s Ex. W, ECF 33-23.

The next day, Chief Inspector Werner ordered Plaintiff to EAP's office and had Lieutenant James Ferguson request Plaintiff relinquish her service weapon voluntarily, which she did.  *See* James Ferguson Dep. 10:5-8, ECF 33-24.  In his deposition, Lieutenant Ferguson stated Plaintiff did not appear to be a danger to herself or others.  *Id.* 14:9-11.  Ferguson proceeded to memorialize this interaction in a memorandum.  *See* Pl.'s Ex. Y, ECF 33-25.  In early February, Sergeant Charles Coan wrote a 2022 performance review for Plaintiff in which he marked her "unsatisfactory" in five of seven categories.  *See* Pl.'s Ex. BB, ECF 33-28.  This was Plaintiff's

only performance review during her time in homicide, she did not sign it, and per Plaintiff's brief, she did not know about its existence until the start of this lawsuit. *See* Pl.'s Resp. at 35, ECF 33. According to the City, the lack of prior evaluations was because of the COVID pandemic. *See* Defs.' Reply at 8, ECF 36.

Plaintiff moved to the Gun Permits Unit on January 24. *See* King Dep. 352:20-24. Her first day, she found a plastic rat in her desk, which she interpreted as further retaliation for her many complaints. *Id.* 373:17-374:2. She would eventually take a month of FMLA leave due to stress. *Id*. 349:7-11. Plaintiff's brief represents, and Defendants do not dispute, that no one from the Police Department reached out about the urgent mental health evaluation Chief Inspector Werner requested until almost two years after Plaintiff's reassignment, after this lawsuit commenced. *See* Pl.'s Resp. at 65, ECF 33. *See also* Mo. for Protective Order, ECF 21.

This lawsuit followed in March 2024. *See* Compl., ECF 1.

## II.      Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), and explored by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment will be granted when "the movant establishes that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.*" Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (internal citations omitted).

## III.     Discussion

Plaintiff's complaint is framed broadly, with seven counts seeking to litigate what it describes as a culture of sexism in the homicide unit. But the extensive record developed in

discovery offers too little support for most of these broad claims.[3]  Without enough evidence of intentional discrimination, a jury could not reasonably find a denial of equal protection, the existence of a hostile work environment, or supervisory liability. There is also no basis to toll the statute of limitations on the whistleblower retaliation claim in Count III.  There is, however, enough evidence to support a jury finding for retaliation under Title VII and the Pennsylvania Human Relations Act, so summary judgment on Counts V and VII will be denied.

### A.    Summary Judgment is Granted on Counts I, IV, and VI – Hostile Work Environment under 42 U.S.C. § 1983, Title VII, and the Pennsylvania Human Relations Act

Under Title VII, the PHRA, and § 1983, plaintiffs can recover damages when they have endured a workplace hostile enough "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).[4]  The inquiry looks at the totality of the circumstances in a workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance [. . .and the] effect on the employee's psychological well-being." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

---

[3] Relatedly, no weight can be given to Plaintiff's Sur-Reply Brief, ECF 41, presenting the sworn affidavits of another female detective alleging retaliation after a protected complaint, as discovery has long since closed.

[4] The PHRA and 42 U.S.C. § 1983 share Title VII's standards and precedents.  *See Renna v. PPL Elec. Utilities, Inc.*, 207 A.3d 355, 368-69 (Pa. Super. 2019) (discussing the PHRA's protections against hostile work environments in terms of Title VII cases); *see also Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 426–29 (3d Cir. 2020) ("§ 1983 shares the same elements for discrimination purposes as a Title VII action . . . And a robust consensus of persuasive authority exists to clearly establish that creating a hostile work environment constitutes a § 1983 violation") (citations omitted).

A plaintiff alleging a hostile work environment claim must prove "1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

Where a hostile work environment exists, 42 U.S.C. § 1983 allows a plaintiff to hold individual defendants responsible for their actions in creating it. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). As with all § 1983 claims, the plaintiff must show "purposeful discrimination," meaning "not that a female plaintiff was treated badly, but rather that she was treated differently than similarly situated males because she is a woman." *Hiester v. Fischer*, 113 F. Supp. 2d 742, 747 (E.D. Pa. 2000). This standard is "demanding." *Donnelly v. Cap. Vision Servs., LLC*, 644 F. Supp. 3d 97, 108 (E.D. Pa. 2022) (McHugh, J.).

Three of Plaintiff's counts seek to hold the City and the individual defendants liable for what she describes as a the "boys' club" in the homicide unit. Pl.'s Resp. at 9, ECF 33. There is no question that Plaintiff experienced a difficult and unsuccessful transition to homicide. But to succeed, Plaintiff must establish that her difficulties were the result of her sex, and that link is missing in too many instances. Plus, when she complained to superiors, complaints were opened for investigation. Taking the record as a whole, a jury could not reasonably conclude that Plaintiff establishes all the elements of a hostile work environment claim.

### 1.    *Intentional discrimination and severity or pervasiveness*

The central inquiry is whether Plaintiff's negative experiences in the homicide unit can be sufficiently ascribed to intentional discrimination. This assessment is complex. On the one hand, "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance,

and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990). A court must therefore "analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating" the counts. *Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001).  On the other hand, hostile work environment claims do not exist to maintain "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  And the hostility alleged must be linked to Plaintiff being a woman.

Ultimately, the case's extensive record includes too little support for too many of the incidents Plaintiff alleges comprised the gender-based discrimination. In terms of the claim's elements, there is not enough support for intentional discrimination based on gender, and not enough incidents to establish pervasiveness or severity.

First, some incidents of purported discrimination are supported only by Plaintiff's subjective impression or inference about her colleagues' motivations or states of mind. For example, during Lieutenant Marshmond's October 2021 meeting, his purported use of the term "B-boys" in the describing the squad has a gendered sound to it, but by itself means little. It may have been embarrassing for Plaintiff to be questioned about her knowledge, *e.g.*, the Crime Code and her investigative skills, but it is not discrimination for a supervisor to explore a subordinate's capabilities, and there is nothing in the record to suggest male detectives were not similarly evaluated.  Nothing in the record supports the conclusory assertion that Captain Smith brought Plaintiff on with no regard for her abilities and had "no intention of following through" on his promise to offer support.  Pl.'s Resp. at 41, ECF 33.  Nor is there any evidentiary support for the specific assertion that "Chief Inspector Werner took Det. King's gun in order to frame her as a

hysterical, unstable woman." *Id.* at 44. A plaintiff's "purely subjective impression without any factual support amounts to nothing of legal significance and is insufficient to defeat a motion for summary judgment." *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990). Hostile work environment claims require proof of *intentional* discrimination within a workplace's total culture, and descriptions of Plaintiff's subjective impression and assumptions of other people's motivations cannot prove intent without evidence of more overt gender-based discrimination.

Plaintiff's claims that her coworkers and supervisors denied her training and assistance to do her job effectively suffer from the same problems. For example, she claims Captain Smith never gave "any of the assistance or training" he promised. *Id.* at 11. From there, "it quickly became clear the other detectives in the Unit were not interested in helping Plaintiff." Pl.'s Resp. at 12, ECF 33. Plaintiff then maintains that she struggled to clear the car processing backlog because "several detectives were withholding the warrants that she needed to perform her job." *Id.* at 8. If her characterizations of the record were accurate, such a freeze-out could well be evidence of "setting someone up to fail," a form of workplace discrimination the Third Circuit has credited in the presence of other evidence of intentional discrimination. *See Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001).

But the record does not support such a calculated and broad-based denial of help or opportunities. Undisputed evidence shows formal trainings for detectives were rare and signing up for them was a hectic process. *See* Daniel Brooks Dep. 116:19-118:13 (formal trainings were very rare and had limited spots and an ad-hoc signup process). Most of detectives' training came from studying and learning from their colleagues. *See* Smith Dep. 49:16-21. Captain Smith testified that he believed Plaintiff could learn this way from her fellow detectives, undermining

16

the assertion he had no intention of honoring his promise of support; he just expected her to learn from her peers. *See id.* 50:9-51:23 ("[Y]ou could learn by osmosis just by watching what [other detectives] did . . . If she wanted that training, if she wanted to take a deep dive into video, it was right there for her to do so").  Witnesses testified, and Plaintiff herself concedes, that some of her peers did help: Plaintiff discussed learning from Detective Tyrone Davis and others, and several if her supervisors pointed to times she learned from working with others; *see, e.g.*, King Dep. 64:11-65:5; 66:15- 67:18; 70:23-71:17; Smith Dep. 22:1-11, 59:12-60:7, 65:15-66:17; Marshmond Dep. 68:4-9, 70:20-71:19, 72:13-74:4.  Plaintiff was also supported in other ways. When Detective Crone filed his EEO complaint against Plaintiff, the other two male detectives present quickly contradicted his account of events.  *See* Pl.'s Ex. FF, Conway EEO Report at 11, ECF 33-32.  The sum of all this evidence would stop a reasonable jury from finding Plaintiff's peers froze her out from doing her job.

Regarding her assignment to car processing, Plaintiff implies the job was "make-work" designed to get her and Detective O'Brien out of the way.  *See* Pl.'s Resp. at 42, ECF 33.  But Plaintiff herself acknowledged the importance of the role, and a man succeeded her in the position. *See* King Dep. 235:1-240:1; 241:9-23; 206:6-11.  As to some detectives avoiding work with her, Lieutenant Brooks and Detective Murray described how Plaintiff's peers were frustrated by her performance and stopped bringing their search warrants to her for processing.  *See* Daniel Brooks Dep. 60:8-10.  This included Detective Slobodian, another female officer who had made her own complaint of sex discrimination, and whom the record shows was certainly not hostile to Plaintiff. *See id.* 57:12-58:7. Plaintiff's response, that she had no idea why people were not sharing information with her, *see* King Dep. 207:23-208:6, does not readily support an inference that it was because she was a woman.  The more competitive, individualistic environment of the

homicide unit frustrated Plaintiff compared to earlier offices, which were more of a "tight-knit family," *see id.* 43:7-8, a difference in culture confirmed by the testimony of Captain Smith, who described homicide detectives as "mercenaries."   Smith Dep. 63:23-64:10.   But Plaintiff's discomfort with how others interacted with her does not suffice to prove discrimination.

As to desk assignments in the new building, on its face the evidence Plaintiff cites might support disparate treatment.  But she fails to note how many detectives overall failed to get desks or to offer any details about varying responsibilities or seniority that might represent circumstantial evidence of discriminatory intent.  Instead, she poses rhetorical questions, asking "what are the odds that at least half of the non-administrative female detectives [did not receive desks] when they only make up 8% of the detectives in the unit[?]"  Pl.'s Resp. at 43, ECF 33. Such insinuations alone do not suffice for a jury to infer discriminatory intent.

Plaintiff also places great emphasis on her difficulty in getting a partner. She contends that because supervisors ultimately had the power to assign partners, her long wait in getting partners necessarily reflects intentional discrimination.  *See* Pl.'s Resp. at 42, ECF 33. This ignores how the process typically worked and further ignores the context in which Plaintiff joined the homicide unit.

Beginning with context, within three months of Plaintiff's transfer in, because of COVID "you really didn't have any consistency with anybody working with anybody."  Coan Dep. 23:14-24:20.  Like many other cities, during 2020 and 2021 Philadelphia saw a record-setting number of homicides.  *See* Smith Dep. 37:20-38:5. This resulted in detectives handling close to double their normal caseloads in a unit that was already high-pressure because of the nature of homicide investigations.  *See* Daniel Brooks Dep. 27:6-28:11. The operational challenges are self-evident.

Beyond that, the record does not support Plaintiff's premise that the partnering process had a formal structure controlled by command officers. First, each detective's assigned cases were their own responsibility, with an informal partner as backup. *See* Coan Dep. 33:16-34: 9. Virtually all the witnesses agreed detectives may not work the streets without backup, but further agreed that backup was freely available. *See, e.g.*, Marshmond Dep. 15:7-12; Smith Dep. 33:5-6, 15-16. Plaintiff has not actually shown evidence that her investigations were hampered by not having an assigned partner, and as stated above, there is evidence she sought and received help at various times. Regarding the assignment of partners, matching with a partner was a mutual and voluntary process. *See, e.g.*, Coan Dep. 33:16-34; *see also* Daniel Brooks Dep. 43:4-44:9. There is also evidence that Lieutenant Brooks, along with Captain Smith, tried to find partners for Plaintiff and simply failed. *See* Daniel Brooks Dep. 42:1-20. That included Detective Murray, a highly regarded investigator. *See id.* 43:20-24. As noted above, Plaintiff does not contend that Murray's refusal to become her partner as based on her being a woman, nor could she, as Murray became partners with another female detective, Antoinina Anderson. *See id.* 44:8-9.

Plaintiff contends that ten male detectives joined the unit after her and found partners. This could potentially support an inference of discrimination. But as with the assignment of desks when the Department relocated, Plaintiff has not developed the record in a way to establish that inference. She does not, for example, point to evidence that supervisors assisted those detectives in ways that they did not support her. Nor does she account for prior relationships among veterans of the homicide unit with newly transferred detectives, and the depositions in this case make clear that many of the officers had worked together previously, as Smith and Brooks had with Plaintiff. *See, e.g.*, Marshmond Dep. 53:22-55:16.

There is also significant evidence that some of Plaintiff's peers had issues working with her.  Some of these instances involve disagreements over the handling of investigations.  *See, e.g.,* Coan Dep. 37:10-40:19 (describing arguments between Plaintiff and her peers over witness interviews, arrests, and other investigatory decisions).  Other issues involved Plaintiff's struggles to perform the searches and other functions she needed to perform without significant communication.  *See* Daniel Brooks Dep. 57:12-20 (describing a complaint from Detective Slobodian that Plaintiff would call her dozens of times in completing a single task); *id.* 15:8-23:17 (outlining multiple detectives in each platoon Plaintiff worked in who complained about her proficiency).  The fact that these concerns were expressed by both men and women, including the observation of Captain Danielle Vales that "she cannot perform in that assignment," Pl.'s Ex. I, ECF 33-9, dramatically weakens Plaintiff's contention that only gender can explain her difficulty in finding a partner.

Looking beyond Plaintiff's broad contentions, the remaining specific incidents are not severe or pervasive enough to suffice for a hostile work environment claim.  In Lieutenant Marshmond's second meeting with Plaintiff, she testified that he berated her for taking a day-work job veteran members of the unit would want, gained through her special relationship with Captain Smith. Marshmond admits he thought Plaintiff was being pampered. *See* Marshmond Dep. 49:17-53:12. A jury could certainly view this interaction as embodying gender stereotypes, but Plaintiff's encounters with Marshmond are too sporadic to be deemed pervasive on their own.

Nor could Plaintiff reach pervasiveness through the two incidents involving Detective James Crone. He sent her a nearly nude photo of himself and hinted he wanted one in return, which Plaintiff found unwelcome.  But Crone desisted, and Plaintiff did not report this until much later, when Crone lodged his preemptive, unfounded complaint against her. And his email, sent in the

guise of a "friend," about how she would never be a great detective could also be seen as gender-biased, but hardly severe.

"Severe" discrimination is reserved for extreme, sometimes physical acts of harassment in the workplace. *See, e.g.*, *Felder v. Penn Mfg. Indus., Inc.*, 303 F.R.D. 241 (E.D. Pa. 2014) (McHugh, J.) (finding severe discrimination where a coworker yelled racial slurs whenever he saw the plaintiff and ultimately body-slammed the plaintiff in the workplace).    Otherwise, discrimination must be "pervasive," meaning there is "a continuous period" of harassment. *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990). *See generally De Piero v. Pennsylvania State University*, 769 F.Supp.3d 329, 350-354 (E.D. Pa. 2025) (discussing pervasiveness in terms of the factors laid out in *Harris v. Forklift Systems*).    Plaintiff's lack of a partner was a pervasive condition, but one she fails to link to her being a woman, and the most troubling incident, Crone's photo, was isolated and only belatedly reported to supervisors. Plaintiff also points to comments from Slobodian and Leahy's depositions and to Detective Laura Hammond's EEO complaint, but "comments referring to other individuals that were merely overheard by [plaintiff] are the sorts of 'offhanded comments and isolated incidents' that the Supreme Court . . . cautioned should not be considered severe or pervasive enough to constitute a hostile work environment." *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) The record shows the homicide unit to be a tense workplace dominated by men, but without clearer or more pervasive evidence of discrimination, a jury could not find it a hostile work environment based on gender.

In all, there is not enough evidence that if Plaintiff were a man "she would have not been treated in the same manner." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996). Her personal impressions, speculation, and rhetorical questions cannot take the place of

21

direct evidence, sound inferences based on circumstantial evidence, or documented instances where similarly situated male detectives were treated differently.

### B.  Summary Judgment is Granted on Count I – Equal Protection Clause Liability under 42 U.S.C. § 1983 against Captain Jason Smith, Lieutenant Hamilton Marshmond, Lieutenant Daniel Brooks, and Chief Inspector Christopher Werner

In Count I, Plaintiff also sues four members of the Department who hold various supervisory roles for a denial of equal protection.  For a Section 1983 claim for a denial of equal protection, "plaintiffs must prove the existence of purposeful discrimination." *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990).  This requires her to prove that she "receiv[ed] different treatment from that received by other individuals similarly situated", and that "any disparate treatment was based on her gender."  *Id* at 439.

Some of this discussion is necessarily repetitive, because Plaintiff points to the same evidence against the same defendants in the hostile work environment claim.  And as with her hostile work environment claim, her response here suffers from a failure to link specific facts to the broad contentions she makes.  Plaintiff begins by arguing that she was hired because of her gender to fill a "diversity quota," and that this shows disparate treatment on its face.  Pl.'s Resp. at 33, ECF 33.  But I am hard pressed to treat a mandate from the Commissioner to bring more women into Homicide as proof of a denial of equal protection.  That is particularly so when Captain Smith testified that he recruited Plaintiff because he has worked with her previously and found additional value in her ability to speak Spanish.  *See* Smith Dep. 27:23-28:2.

Plaintiff contends that after hiring her Smith breached a promise that provide her with a partner, but as discussed above the record is clear that most partner relationships were not imposed by command but developed organically.  Before her first case assignment, she assisted

other homicide detectives for about a week "with interviews or whatever they needed." King Dep. 66:7-68:16. Plaintiff admits she did not tell her direct supervisor Lt. Riehl that she didn't know how to do interviews, nor discuss this with other detectives. *See id.* 69:8-12, 70:16-22. Detective Sloan and his partner were formally assigned to help her with her first case, and other detectives assisted later. *See id.* 64:11-65:5; 66:15- 67:18; 70:23-71:17. And as emphasized above, Plaintiff would have been in Homicide only three months before the COVID pandemic dramatically altered police operations starting in mid-March, 2020.

Her transfer to B Squad did not result in her acquiring a partner. She expected to work with Detective Joseph Murray who "changed his mind" so that to "to work the street" she would need to ask a partnered male detective to accompany her. Defs.' Ex. A ¶ 43, ECF 32-1. Importantly, however, she did not attribute Murray's decision to her being female. *Id.*; King Dep. 242:16-243:7; 235:17-236:15. In fact, as discussed above Murray had chosen another woman detective as a partner.

Following transfer, Plaintiff worked at the front desk for about a week and was then moved to vehicle processing. *See* King Dep. 235:1-237:13; 237:14-238:16; 241:9-23. Significantly, she would have been succeeded by a male detective after she was moved from the desk. *Id.* 238:17-240:1. Plaintiff was then assigned to process vehicles for evidence because of a backlog, which she acknowledges was an important part of a homicide investigation. Defs.' Ex. A ¶ 41; King Dep. 199:15-201:15; 206:8-11; 208:7-21; 213:12-214:16. In some cases, detectives did not promptly provide her with vehicle warrants, but these included males such as Murray and females such as Slobodian. *See* King Dep. 204:9-23. Importantly, Plaintiff did not ascribe this to her being female. *Id.* 207:13-208:22; 205:9-22; 207:9-18. When this matter and her complaint that women were not treated fairly were brought to Captain Smith's attention at a meeting in February 2022, he directed that an EEO complaint be filed.

Defs.' Ex. A ¶¶ 55-58.

Meanwhile, Plaintiff contends that Lt. Marshmond unfairly berated her on two occasions for a lack of knowledge, but as her supervisor he was entitled to evaluate any deficits in her performance. It seems clear that Marshmond saw Plaintiff as seeking to curry favor with her superiors, as evidenced by her baking birthday cakes and asking him if he would like one. It also seems clear that he viewed her as getting special treatment from Captain Smith. But other than asking rhetorical questions in her responsive brief—*e.g.*, "would this have happened if Det. King were a man?"[5]—Plaintiff does not connect what appears to be some personal antipathy toward her to her being a woman.

Finally, Plaintiff's inadequate theory about desk assignments also fails as applied to Marshmond individually: there is still no relevant comparison and no indicium of discriminatory intent. Plaintiff is correct that discrimination can be "subtle," Pl.'s Resp. at 43, ECF 33, but this subtlety only underscores the importance of pointing to some evidence that this disparity actually stemmed from purposeful discrimination.

As to the two remaining individual defendants, Lieutenant Brooks and Chief Inspector Werner, Plaintiff points to little evidence. Her only allegation against Lieutenant Brooks in Count I is that he failed to "provide her with a partner." Pl.'s Resp. at 42, ECF 33. But as discussed earlier, lieutenants did not customarily assign partner matches, so there was no duty to "provide" Plaintiff with a partner, such that failing to do so was discriminatory. And Plaintiff does not dispute that Lieutenant Brooks attempted to find Plaintiff a partner while he was her commander.

---

[5] Pl.'s Resp. at 35, ECF 33.

Regarding Chief Inspector Werner, Plaintiff points to no proof at all that he "took Det. King's gun in order to frame her as a hysterical, unstable woman." Pl.'s Br. at 44, ECF 33. Certainly, the stereotype of the "hysterical, unstable woman" exists in American culture, and can be used as a tactic to try to silence them. And as discussed below, confiscation of Plaintiff's weapon has substantial relevance to the retaliation claim. But her equal protection argument is not so much a claim as it is a characterization of Werner's motivation for his action, for which she has no evidentiary basis. A jury cannot consider such unsupported conjecture as evidence, and so it lends no support to her theory on summary judgment. *See Carlson, supra*, 918 F.2d at 416; *Jones v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000) ("a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial").

### C.    Summary Judgment is Granted on Count II – Supervisory Liability under 42 U.S.C. § 1983 against Captain Jason Smith

Plaintiff's second count seeks to hold Captain Smith liable for alleged discrimination based on his actions as her supervisor. Supervisory liability under § 1983 exists where a supervisor "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). *See also Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988).

Plaintiff argues that Captain Smith acquiesced in others' mistreatment by taking no action to stop harassment other than forwarding complaints, knowing that internal affairs and the equal employment office were by turn unwilling or unable to stop the harassment she faced. Pl.'s Resp. at 47, ECF 33. Defendants respond by identifying the repeated actions Smith took on King's

behalf within the structures available in the Department. *See* Defs.' Reply at 16, ECF 36. In the absence of proof that Captain Smith directly violated Plaintiff's rights by creating a hostile work environment, he can only be liable if he knew of and acquiesced to others' discrimination.

The Third Circuit has interpreted acquiescence to mean doing nothing or next to nothing to such a degree that it amounts to intentional discrimination. In *Andrews v. City of Phila.*, 895 F.2d 1469, 1479 (3d Cir. 1991) it found that acquiescence existed where a police captain "was aware of" problems with pornography projected in a police squad room, rampant sexist language, and case file sabotage against female detectives, "but *did nothing* to stop them." (emphasis added); *see also Coleman v. Kaye*, 87 F.3d 1491, 1508 (3d Cir. 1996) (finding acquiescence where plaintiff presented concerns in writing and the supervisor "chose to take *no action whatsoever*") (emphasis added). These formulations reflect the principle that discrimination under § 1983 must be "purposeful." *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 19192).

Here, it is undisputed that Captain Smith did several things in response to Plaintiff's complaints, including passing information onto IAD, filing the EEO complaint, telling Crone to not come to homicide, and telling other officers to be mindful of Plaintiff in January. Contemporaneously, as she complained about others, she expressed her then-belief that whatever was going on was not Captain Smith's fault. *See* Pl.'s Ex. L, ECF 33-12. Ironically, Plaintiff's response to this motion even quotes Smith's deposition testimony that he wanted the EEO unit to perform a full investigation and interview every detective in homicide to get to the bottom of Plaintiff's workplace struggles. *See* Smith Dep. 118:1-7 (cited in Pl.'s Resp. at 27, ECF 33).

Even if a jury thought Smith's actions inadequate, it could not reasonably find that any failures on his part amounted to intentional discrimination.

26

**D.    Summary Judgment is Granted on Count III – Pennsylvania Whistleblower Law**

Plaintiff's count under the Pennsylvania Whistleblower Act is time-barred. The Pennsylvania Whistleblower Act provides that "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report . . . to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act."  43 Pa. Con. Stat. §1423(a).  A plaintiff must file an action under the Act within 180 days of the retaliation's occurrence.  *See* 42 Pa. Con. Stat. § 1424(a).

The Pennsylvania Commonwealth Court has held that there is "no discretion" for courts to extend the time limitation.  *O'Rourke v. Pennsylvania Dep't of Corr.*, 730 A.2d 1039, 1042 (Pa. Commw. Ct. 1999); *Perry v. Tioga Cnty.*, 649 A.2d 186, 188 (Pa. Commw. Ct. 1994). This strict language has led other judges of this Court to decline to apply the "continuing violations" doctrine to the statute, predicting that the Pennsylvania Supreme Court would do the same.  *See e.g. Albright v. City of Phila.,* 399 F. Supp. 2d 575, 595 n.27 (E.D. Pa. 2005).

The record shows that the alleged adverse employment action happened in January of 2023, so the statute of limitations ran by August of 2023, rendering this claim untimely.

**E.    Summary Judgment is Denied on Counts V and VII – Retaliation**

As to retaliation, unlike the other counts, there is sufficient evidence to suggest that the City's actions in and around January 2023, as implemented by Chief Inspector Christopher

Werner,[6] were motivated by Plaintiff's complaints, and that their stated reasons for those actions were pretextual.

### 1.  Retaliation's Elements and Affirmative Defense

Under Title VII it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000(e).[7]  A plaintiff claiming retaliation must make a *prima facie* case that "(1) she engaged in a protected employment activity, (2) her employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a 'causal link' exists between the adverse action and the protected activity." *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007) (*citing Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001)).[8]

Once the plaintiff makes their *prima facie* case, the burden shifts to the defendant to prove a legitimate, non-discriminatory motive. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). After the employer does so, the employee can then rebut by showing evidence suggesting the reason is a mere pretext. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered

---

[6] There is no question that a chief inspector represents a supervisory official for whose actions the City may be vicariously liable under Title VII. *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 278 (2009) (discussing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

[7] Title VII also protects an employee from retaliation based on their participation in a proceeding under Title VII. 42 U.S.C. § 2000(e). This protection is not relevant here.

[8] The PHRA follows the same standards, elements, and caselaw as Title VII. *See Slagle v. County of Clarion*, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action").

### 2. **Protected activity of opposition**

"Opposition" to unlawful employment practices "can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.'" *Moore,* 461 F.3d at 343 (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir.2006)). These complaints must be specific enough for management to know the basis of discrimination, and cannot be mere general "complaints of unfair treatment." *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995). Plaintiff's in-person and emailed complaints with her supervisors meet this standard. Despite Plaintiff's frequent hesitancy to name names, both in person and in her emails, a jury could find her communications were specific enough to count as complaints under the statutory schemes.

### 3. **Adverse action near in time to the complaints**

To support a claim of retaliation, a plaintiff must prove they suffered an action which was adverse enough to "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). Formal demotions and reassignments that lead to "direct economic harm" are easily adverse actions. *See Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). So are actions by supervisors that sabotage or inhibit a plaintiff's work. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999) (removing a plaintiff insurance agent's office and secretary and stealing her work files were adverse actions supporting retaliation)*; see also Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) ("Workplace sabotage and punitive scheduling claims, if believed by

29

a jury, constitute 'adverse employment actions' for purposes of the third element of plaintiffs' *prima facie* case.").

Until January, 2023, Plaintiff's claims about adverse employment actions are comparatively minor, including assignment to the processing of vehicle warrants, and the lack of a desk in the new police headquarters, neither of which she connects to an inability to perform her job or a reduction in pay. Plaintiff's demotion to the gun permit unit is different, as decreased pay and prestige suffice for an adverse action. *See Evans*, 166 F.3d at 152-52; *see also Burlington Northern*, 548 U.S. at 71 (finding that transfer away from a position that was "objectively considered a better job" can be an adverse action). The record is clear that the gun permit unit offers fewer chances for overtime than the homicide unit offers. *See, e.g.*, Smith Dep. 21:4-5 (describing the difference in overtime between homicide and gun permits as "huge"). Separately, for a police officer to have their gun taken away is a disturbing and humiliating event. Plaintiff certainly meets this element.

#### 4. Causal link between the complaint and the adverse employment action

A plaintiff must prove that "retaliatory animus was the 'but-for' cause of the adverse employment action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249 (3d Cir. 2017) (quoting *Nassar*, 133 S.Ct. at 2521). This *prima facie* causal burden is "not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Causation in part requires the adverse action to come after the protected activity, with a shorter gap being more indicative of a causal nexus. *See, e.g.*, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding a two-day gap between a complaint and an adverse action supports a causal link). Plaintiffs must also show the defendant supervisors knew about the protected activity. *See Moore*, 461 F.3d 331 at 351.

Here, it is undisputed Plaintiff's supervisors knew about her emails, EEO complaints, and informal complaints to Captain Smith. As to Chief Inspector Werner individually, although he did not move to homicide until the fall of 2022, *see* Werner Dep. 37:24-38:21, Lt. Marshmond reported on Plaintiff's complaints in early December in an email describing them as "repeated false allegations." *Id.* 96:11-98:6; Pl.'s Ex. R.  Werner was also copied on emails regarding Crone's fall 2022 EEO complaints, *see* Defs.' Ex. L & Ex. M, and discussed it with Smith, *see* Defs.' Ex. O. And he would have received all of Plaintiff's January emails, including the longest one which recounted many prior events.

Plaintiff indisputably made many complaints, and her change of status followed immediately after her longest and most strident broadside. There is also Plaintiff's testimony that she found a plastic rat in her new desk upon her arrival in the Gun Permits Unit, suggesting the existence of retaliatory animus against her within the Department.

In sum, Plaintiff has stated a *prima facie* case of retaliation.

### 5.    Legitimacy vs. pretext

The defendant then bears the burden of producing evidence showing they had a legitimate, non-retaliatory motivation for the adverse action.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981).  Plaintiff may then challenge that defense by showing evidence that the employer's legitimate reasons are pretextual, meaning they are "either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). This entails showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder *could* rationally find them unworthy of credence." *Id.* at 765 (emphasis added).

Here, the Defendants offer legitimate, non-retaliatory reasons for the adverse actions Plaintiff experienced. As to her assignment to vehicle warrants, Defendants describe the duties as important, and the position a desirable one because of its more predictable schedule. As to her lack of a desk, the defense appears to attribute that to limitations of space in the new facility. As to the decision to confiscate Plaintiff's pistol and reassign her, the City contends it was motivated by a sincere concern about her safety and was done according to all appropriate protocol. *See* Defs.' Reply at 29-30, ECF 36. To underline Chief Inspector Werner's professed concerns, they point to an email generated around that time by Deputy Inspector Layton, Defs' Ex. T, ECF 32-21, quote various witnesses' concerns about Plaintiff's mental health, and stress Plaintiff's repeated statements to the effect that she "did not want to hurt anyone." *Id.* The record confirms that this could be a legitimate basis for the gun confiscation, as evidenced by the Directive 8.8, *see* Defs.' Ex. S, ECF 32-20, and as elaborated on in the depositions of Officer Tracy Brooks and Chief Inspector Werner. And Plaintiff freely admits her email may have sounded "a little crazy." King Dep. 136:24-137:3.

But Plaintiff points to several potential weaknesses in the proffered explanation. To start, the record shows a dispute over how visibly unwell Plaintiff really was. Officer Tracy Brooks, the trained mental health professional sent from EAP to assess Plaintiff's mental health, officially concluded she did not meet the standards to have her gun repossessed. *See* Tracy Brooks Dep. 9:10-11:16, ECF 33-21. He later testified that Chief Inspector Werner pressured him to reconsider his conclusion, which he refused to do, creating what Brooks called a "pressurized situation." *See id.* 12:7-13:4. And when Brooks turned the question on Werner and asked if Plaintiff had said

anything that made Werner feel she should not have her firearm, Brooks says Werner replied "well, no." *See id.* 42:4-16.  Lieutenant James Ferguson also did not believe Plaintiff was a danger to anyone when he went to repossess her gun.  *See* Ferguson Dep. 14:9-11, ECF 33-24.  Nor did Lieutenant Thomas Walsh, who met with Plaintiff as she sobbed on January 5th.  *See* Thomas Walsh Dep. 96:21-23, ECF 33-27.  Captain Smith and Lieutenant Brooks, despite being defendants in this action, stated in their depositions that they did not notice anything awry about Plaintiff's behavior at this time.  *See* Smith Dep. 10:12-16; Daniel Brooks Dep. 107:20-108:1. This consistent testimony from her colleagues could raise a jury's doubts about Chief Inspector Werner's motivation for his actions.

And there is an inconsistency in Chief Inspector Werner's actions and words: in his memo requesting Plaintiff be moved from the homicide unit, he specifically requested she transfer to the gun permits unit.  *See* Pl.'s Ex. W, ECF 33-23.  Yet during his deposition, he denied requesting to move her to any unit in particular.  *See* Werner Dep. 145:13-146:10. A jury could find this discrepancy is an attempt to distance himself from an adverse demotion.

Similarly, a jury could conclude that discrepancies in police accounts reflect a misleading attempt to characterize Plaintiff as dangerous. Some of Plaintiff's emails state that she did not want to "hurt" anyone. In her testimony, she placed this in the context of not hurting others' careers, *see* Pl.'s Resp. at 32-33, ECF 33, a characterization with which Captain Smith agreed.  *See* Smith Dep. 116:8 (stating he believed Plaintiff was "not at all" threatening others when she referred to not hurting anyone). The sole reference to the word "kill" appears in a single memo prepared by Sergeant Judge about time she spent with Plaintiff that day, while another memo by Deputy Inspector Layton, also present, makes no such reference. *Compare* Pl.'s Ex. V *with* Defs.' Ex. T.

But Chief Inspector Werner adopted the term in his deposition, and throughout their briefing Defendants emphasized this purported threat as a justification for seizing Plaintiff's weapon.

A final inconsistency weighing against the need to seize Plaintiff's weapon is the fact that the Department did not follow up on Plaintiff's mental health screening, as directed by Werner and required by Directive 8.8. *See* Directive 8.8, Defs.' Ex. S, ECF 32-20. The policy requires transporting the employee to a crisis response center or, in less urgent cases, logging the employee as sick until the police medical director approved a return to work. *Id.* That protocol was not followed, and no exam took place for almost two years, while this case was pending, a delay a jury could find undercuts the supposed urgency of Plaintiff's condition.

In sum, a jury could reasonably find that the actions taken against Plaintiff were warranted, but just as reasonably find they were a pretext. Summary judgment is therefore not warranted on Counts V and VII.

## IV.    Conclusion

For the reasons above, summary judgment is granted on Counts I, II, III, IV, and VI. Summary judgment is denied on Counts V and VII. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge
